UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )
v.                                  )           No. 3:24-CR-71-KAC-JEM
                                    )
ANTOINE A. WILCOX,                  )
                                    )
          Defendant.                )

**REPORT AND RECOMMENDATION**

This case is before the Court on the United States's Emergency Motion Under 18 U.S.C [§] 3145 for Revocation of Magistrate Judge's Release Order [Doc. 8]. United States District Judge Katherine A. Crytzer referred this motion to the undersigned for report and recommendation [Doc. 9]. *See* 28 U.S.C. § 636(b). The Government asks the Court to revoke Defendant Antoine Wilcox's conditions of release imposed following his arrest and a detention hearing in the Eastern District of Michigan. After a de novo review, and assuming Defendant has rebutted the presumption, the undersigned finds that Defendant poses a danger to others and that there is no condition or combination of conditions that will reasonably assure the Court of the safety of the community and the Defendant's appearance as required. Accordingly, the undersigned recommends that the District Judge grant the Government's motion to revoke the release order.

# I. PROCEDURAL BACKGROUND

On June 20, 2024, the Grand Jury returned an Indictment charging Defendant Antoine Wilcox, two named coconspirators,[1] and unnamed others with conspiring to distribute 400 grams or more of a mixture containing fentanyl, a Schedule II controlled substance, from January 1, 2023, through June 20, 2024, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) [Doc. 7 p. 1 (Redacted Indictment); *see* Doc. 3, SEALED]. Defendant is also charged with engaging in a money laundering conspiracy during that same time period in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h) [Doc. 7 pp. 1–2]. Finally, Defendant is charged with possession of 400 grams or more of fentanyl with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) and (2) both allegedly occurring on June 3 through 14, 2024 [*Id*. at 2–3].

Defendant was arrested in Detroit, Michigan [*See* Doc. 5, SEALED], and had his initial appearance in the Eastern District of Michigan on June 27, 2024 [Doc. 10]. Defendant requested a detention hearing in that district, which was schedule for July 2, 2024 [*Id.* at 14].

# II. JULY 2 DETENTION HEARING IN THE EASTERN DISTRICT OF MICHIGAN

Defendant Wilcox and Codefendant Jalen McMillian appeared for a joint detention hearing before Magistrate Judge Anthony P. Patti in the Eastern District of Michigan on July 2, 2024 [Case No. 2:24-mj-30245, Doc. 18, Transcript].[2] Assistant United States Attorney Michah Zack

---

[1] Codefendant Jalen McMillian was arrested and first appeared in the Eastern District of Michigan on June 27, 2024 [Doc. 11 pp. 1, 19]. A third Defendant, Ra'Shaun D. Wilcox, appeared in this district on July 22, 2024.

[2] The transcript of the detention hearing is filed in Case Number 2:24-mj-30245 in the Eastern District of Michigan.

Siegel Wallace represented the Government. Attorney Byron H. Pitts represented Defendant Wilcox, who was also present.[3]

The Government presented a combined proffer pertaining to both Defendants [*Id*. at 7]. It proffered that Defendants Wilcox and McMillian are charged with conspiracy to distribute fentanyl and with possession of a firearm in furtherance of drug trafficking and that a presumption in favor of detention applies [*Id*. at 7, 9]. According to the Government, both Defendants Wilcox and McMillian were involved in a drug trafficking organization ("DTO") that purchased fentanyl in Detroit, Michigan, and transported it to Tennessee, where it was "process[ed], cut, and s[old]" [*Id*. at 9–10]. Members of the DTO then transported the proceeds back to Detroit, where the money was reinvested in the enterprise [*Id*. at 10]. The Government proffered that following a lengthy investigation, law enforcement executed several search warrants in Tennessee in June 2024 [*Id*. at 10]. AUSA Wallace stated that officers executing a search warrant at a "stash house" on Fifth Avenue seized 4.3 kilograms of fentanyl valued at $52,000, currency in the amount of $47,000, and mail addressed to Wilcox and McMillian [*Id*.]. Prior to execution of the search warrant at the Fifth Avenue property, surveilling officers observed Defendant Wilcox enter the address to be searched using a "key fob or card key" [*Id*. at 11].

According to the Government, the mail seized at the Fifth Avenue location led officers to a second house at 228 Douglas Avenue [*Id*.]. A search of the Douglas Avenue residence yielded three guns, Suboxone strips, and drug paraphernalia [*Id*.]. Local law enforcement had received multiple complaints of drug sales at the Douglas Avenue residence, and an officer "identified

---

[3] Attorney Pitts also represented Defendant McMillian [Case No. 2:24-mj-30245, Doc. 18 pp. 1–2]. Judge Patti advised the Defendants of a potential conflict of interest from joint representation and confirmed that both Defendants waived any conflict from Mr. Pitts representing them at the detention hearing [*Id*. at 4–6].

personally Mr. Wilcox and Mr. McMillian . . . at the 228 [Douglas] address" [*Id*.]. Defendants Wilcox and McMillian were ultimately arrested at Defendant Wilcox's mother's residence in Detroit [*Id*.]. Officers obtained another search warrant for the Mapleridge residence and seized three firearms from that location [*Id*. at 12].

AUSA Wallace asserted that law enforcement searched Defendant McMillian's home at 4826 Fountain View Road and seized one-half gram of fentanyl, $2,100, and a Taurus handgun, which he is prohibited from possessing as a convicted felon [*Id*. at 14, 33–34]. Officers also searched a storage unit belonging to Defendant McMillian and seized drug presses and powder used to cut fentanyl [*Id*. at 14]. AUSA Wallace proffered that mail was seized from the "main stash house" that was addressed to Defendant McMillian at the 228 Douglas Avenue address [*Id*.].

As to Defendant Wilcox, AUSA Wallace proffered that in addition to accessing the "stash house" with a key fob and having mail there, law enforcement searched Defendant Wilcox's storage unit and seized two .38 caliber handguns [*Id*. at 16–17]. Both Defendants were arrested outside Defendant Wilcox's mother's residence, where officers executed a search warrant and seized three handguns [*Id*. at 17–18]. Officers did not identify to whom the guns belonged [*Id*. at 18]. Both Defendants were staying at Defendant Wilcox's mother's house while in Detroit, but Defendant Wilcox did not live there [*Id*. at 19].

AUSA Wallace proffered that Defendant Wilcox has a prior deferred conviction from 2013 for larceny from an automobile and receiving and concealing stolen property [*Id*. at 17]. Also, AUSA Wallace stated that over the last decade, Defendant Wilcox has failed to appear for court fourteen times, although admittedly none of the charged offenses were felonies [*Id*.]. In November 2023, Defendant Wilcox's girlfriend made a domestic violence report alleging that, after an argument, Defendant "began throwing punches at her," got on top of her after she fell, and punched

4

her face [*Id*.]. AUSA Wallace agreed no charges were filed because the victim did not want to prosecute [*Id*.].

The Government argued that no conditions would assure the Defendants' appearance or prevent danger to the community [*Id*. at 19–20]. With regard to the nature and circumstances of the offenses, it asserted that "[t]his is a multi-state, multi-location organization that has a stash house, an additional house that they appear to be dealing out of, and then each of them are found with either drugs or guns in their possession" [*Id*. at 20]. Defendant McMillian had fentanyl, currency, and a handgun in his residence, and Defendant Wilcox had two guns in his storage facility [*Id*.]. Law enforcement seized 4.3 kilograms of fentanyl from the "stash house" and $47,000 [*Id*.].

The Government argued that drug dealing presents a danger to the community and the amount of drugs and money involved here, protected by multiple guns, are an increased danger [*Id*. at 20–21]. It asserted that the weight of the evidence is high because officers conducting surveillance saw both Defendants at the Douglas Avenue address, Defendant Wilcox entering the "stash house," and mail addressed to both Defendants at the "stash house" [*Id*. at 21].

AUSA Wallace argued that Defendant Wilcox's history and characteristics weigh in favor of detention because of his numerous failures to appear and his danger to the community from drugs, guns, and the domestic assault report from November 2023 [*Id*. at 22]. He maintained that Defendant Wilcox proposes living with his girlfriend, who is the victim of the reported assault, and their child in Tennessee [*Id*.]. AUSA Wallace argued that based on these factors and the presumption, Defendants should be detained [*Id*.].

Defense counsel agreed that the presumption in 18 U.S.C. § 3142(e)(3) applied but maintained that the presumption was rebutted by the application of the § 3142 (g) factors

[*Id*. at 14]. Mr. Pitts argued that the Government proffered conclusions about who lived at the searched residences or owned the storage units but offered no facts in support of these conclusions [*Id*. at 23, 30]. He argued that Defendant Wilcox has no serious criminal history [*Id*. at 25]. Instead, Defendant Wilcox received diversion through the Holmes Youthful Trainee Act at age 20 for his sole conviction for receiving and concealing stolen property [*Id*. at 25, 30]. He said most of Defendant's other criminal history is comprised of misdemeanor driving offenses [*Id*. at 25]. Mr. Pitts asserted that Defendant Wilcox does not have a history of violence, offenses involving narcotics, nor offenses involving firearms [*Id*. at 25, 30].

Regarding potential conditions of release, Mr. Pitts argued that Defendant Wilcox has the support of a stable family and that his mother, father, and other relatives were present in the courtroom [*Id*. at 25–26]. He offered Defendant Wilcox's mother as his third-party custodian [*Id*. at 28]. Further, he proffered that Defendant Wilcox's mother is willing to give a security bond on her home and his father is willing to give a security bond on a tow truck from his towing business [*Id*. at 28–29].

While Mr. Pitts acknowledged that Defendant Wilcox had numerous failures to appear, he stated that Defendant ultimately appeared in these cases, and they were dismissed [*Id*. at 26]. Mr. Pitts asserted that the alleged "stash house" at 112 Fifth Avenue is an apartment building, and the drugs and currency were seized from apartment 306 [*Id*. at 27]. He maintained that while Defendants were allegedly seen in the vicinity of the apartment building, they were not seen entering apartment 306 [*Id*. at 27–28].

Finally, as to the danger posed by Defendant Wilcox's release, Mr. Pitts noted that Pretrial Services recommended that Defendant be released on conditions including a $10,000 unsecured bond [*Id*. at 31]. He stated that Defendant Wilcox was willing to go beyond this recommendation

6

by offering a third-party custodian and security in the form of bonds on his mother's home and his father's tow truck [*Id*.]. Mr. Pitts argued that Defendant Wilcox rebutted the presumption by offering a third-party custodian, his lack of criminal history, and contradicting the Government's proffers as to the connections between the searched residences and both Defendants [*Id*. at 32]. He maintained that the presence of third-party custodians and the security bonds would assure the Defendants would report to Tennessee to face their charges [*Id*. at 33].

In response to questions from the Judge Patti, AUSA Wallace agreed that officers saw Defendant Wilcox entering the apartment building with a key fob [*id*. at 35] and later agreed there was no evidence that Defendant Wilcox had a key fob to apartment 306 [*id*. at 36]. But AUSA Wallace stated that officers searched apartment 306 pursuant to a search warrant and found mail addressed to both Defendants at 228 Douglas Avenue [*Id*. at 35–36, 39]. Regarding the proffered third-party custodians and security bonds, AUSA Wallace noted that both Defendants ask to return to Tennessee, rather than remain in Michigan [*Id*.]. He questioned the suitability of Defendant's mother as a third-party custodian and noted that both Defendants were arrested at her home [*Id*. at 37]. He also pointed out that, according to the Pretrial Services Report, Defendant has no income and has not worked for eighteen months but has monthly expenses that exceed $4,100 [*Id*.]. Finally, AUSA Wallace noted Defendant Wilcox's failure to appear on multiple occasions but agreed none remain outstanding [*Id*. at 37–38].

Based upon this evidence, argument, and the Pretrial Services Report, Judge Patti determined Defendant Wilcox had rebutted the presumption of detention [*id*. at 42] and could be released on conditions [*id*. at 48]. Examining the § 3142(g) factors, Judge Patti found the charges to be serious but noted that no drugs or guns were found on Defendant Wilcox's person or in his home [*Id*. at 42–44]. He determined the key fob and the mail in the "stash apartment" connected

Defendant Wilcox to that location [*Id*. at 44–45]. Judge Patti explained that although factor one weighed in favor of detention, it was mitigated by the weak connections between the searched locations and Defendant Wilcox [*Id*. at 45].

As to the second factor, Judge Patti concluded it was "mixed" with some evidence supporting detention, such as the drugs found in the stash house and the guns in his storage unit, and other evidence supporting release, such as Defendant clearing all prior failure-to-appear warrants and having no history of absconding [*Id*. at 45–46].

Judge Patti found Defendant Wilcox's history and characteristics generally supported release, observing that he has a supportive family; a stable residence; no drug use other than marijuana, which is legal in Michigan; and little criminal history with no history of violence, firearms, or drugs [*Id*. at 46–47]. He noted that no charges arose out of the domestic violence report in November 2023 [*Id*. at 47]. Under the fourth factor, Judge Patti found Defendant would present a danger if involved in drug trafficking but found little evidence linking Defendant to drugs and guns [*Id*. at 47–48].

Ultimately, Judge Patti agreed with Pretrial Services' recommendation that Defendant could be released on conditions [*Id*. at 48]. He declined to require a third-party custodian or security bonds but imposed a $10,000 unsecured bond [*Id*. at 48]. He also imposed the following conditions: that Defendant report to Pretrial Services as directed; that he seek employment; that his travel be restricted to the Eastern District of Tennessee; that he reside "at the bond address"; that he refrain from possession or use of controlled substances including marijuana; that he submit to drug testing; that he have no contact with victims, witnesses, or codefendants; that he not possess firearms; and that he submit to electronic monitoring and a curfew [*Id*. at 48–50].

Upon motion of the Government, Judge Patti stayed his release order until 4:00 p.m. on July 3, 2024, to allow the Government to appeal the release order to District Judge Crytzer [*Id*. at 51–52; Doc. 8 p. 1; *see also* Doc. 10-1 p. 2].

## III.    JULY 17 EVIDENTIARY HEARING BEFORE THE UNDERSIGNED

On July 2, 2024, the Government filed the Emergency Motion pursuant to 18 U.S.C. § 3154(a), asking that District Judge Crytzer revoke Judge Patti's release order and continue to stay the release order until ruling on the Emergency Motion [Doc. 8 p. 1]. The Government argues that because Defendant is charged with a drug trafficking offense with a maximum potential penalty of ten years or more of imprisonment, the Court must apply a presumption that no conditions will reasonably assure his appearance as required and the safety of the community [*Id*. at 1–2 (citing 18 U.S.C. § 3142(e)(3)(A))]. It contends that Defendant failed to rebut the presumption and is a danger to the community [*Id*. at 2].

On July 3, 2024, Judge Crytzer continued the stay of Judge Patti's release order until the prompt adjudication of the motion to revoke [Doc. 9 p. 2]. Judge Crytzer also referred the remainder of the Emergency Motion to the undersigned for prompt preparation of a report and recommendation [*Id*. at 2–3]. Judge Crytzer ordered Defendant's expedited transportation to this district [*Id*. at 3].

Defendant appeared in this district on July 8, 2024 [Doc. 16]. At that time, potential retained defense counsel requested a hearing on the Government's motion to revoke, and the Court scheduled a hearing for July 17, 2024 [*Id*.; *see also* Doc. 19].

The parties appeared for an evidentiary hearing on the Government's Emergency Motion on July 17, 2024. Assistant United States Attorney Keith Hollingshead-Cook represented the

Government, and Attorneys Charles C. Burks, Jr., and Jacob A. Feuer represented Defendant Wilcox, who was also present.

The Government presented a collective exhibit [Exh. 1] of eight documents: (1) a state search warrant, application, and affidavit for 112 East Fifth Avenue, apartment 306, in Knoxville, Tennessee and for the person of Ra'Shaun Devell Wilcox; (2) the Knox County Sheriff's Office ("KCSO") Property Receipt listing the items seized in the search of apartment 306 at 112 East Fifth Avenue; (3) a KCSO report of the results of drug testing for substances found in apartment 306 at 112 Fifth Avenue; (4) a state search warrant, application, and affidavit for the search of 228 Douglas Avenue, Knoxville, Tennessee, and the person of Antoine Antonio Wilcox; (5) the KCSO Property Receipt for items seized in the search of 228 Douglas Avenue; (6) an Incident/Investigation Report from the Detroit Police Department ("DPD") documenting the June 15, 2024 arrest of Defendant Wilcox and the search of 14106 Mapleridge Street,[4] Detroit, Michigan; (7) a June 13, 2024 KCSO Incident Report by Defendant's girlfriend alleging child abuse at 1605 Clear Brook Drive, Knoxville, Tennessee; and (8) a November 8, 2023 KCSO Incident Report by Defendant's girlfriend alleging domestic assault at 1605 Clear Brook Drive, Knoxville, Tennessee.

The undersigned has reviewed the Exhibit and observes that KCSO Detective Marcus Parton submitted an affidavit in support of a search warrant for apartment 306 at 112 East Fifth Avenue, Knoxville, Tennessee and the person of Ra'Shaun Wilcox, who is Defendant's brother [Exh. 1, Doc. 1].[5] Detective Marcus describes the investigation of the "Wilcox DTO," which

---

[4]     The address is also stated as "Mapleridge Avenue" within Exhibit 1.

[5]     The undersigned does not summarize all the information provided in Detective Parton's affidavits, only the information relating to Defendant Wilcox.

involves Defendant Antione Wilcox, his brothers Ra'Shaun Wilcox and Karnell Wilcox, and his cousin Jalen McMillian, from November 2023 through June 2024. A confidential citizen informant ("CS-1"), who is a relative of a member of the DTO, reported that members of the DTO refer to it as the "STF," which stands for "small time family." On March 2, 2023, an undercover officer purchased one ounce of heroin from Defendant in a restaurant parking lot. On November 8, 2023, KCSO officers responded to a "domestic matter" at 1605 Clear Brook Drive (Defendant's residence), where Defendant's girlfriend reported that Defendant left the residence with $50,000 and an unknown amount of drugs.[6] On June 5, 2024, officers surveilling Defendant observed him go to 228 Douglas Avenue, then to 112 East Fifth Avenue, then return to 228 Douglas Avenue. Thereafter, Ra'Shaun Wilcox retrieved something from Defendant's vehicle and drove to meet a known customer.

According to Detective Parton's affidavit, on June 13, 2024, KCSO officers reported to 1605 Clear Brook Drive on a domestic matter and observed a strong odor of marijuana in the residence and marijuana in plain view on a desk.[7] On that same day, another confidential citizen informant ("CS-3"), who is also related to a member of the DTO, told law enforcement that Defendant is the head of the DTO and his brother Ra'Shaun Wilcox is his partner. A third brother,

---

[6]    The KCSO Incident Report from November 8, 2023, states that Defendant's girlfriend reported that she and Defendant got into an argument when she said Defendant's brother was better than him at burping their two-month-old infant [Exh. 1, Doc. 8]. She reported that Defendant began "throwing punches" at her and she fell when she dodged them. Defendant then got on top of her and punched her face. Officers did not observe any marks on the girlfriend's face, and she declined to give more information on the incident.

[7]    The KCSO Incident Report from June 13, 2024, relates that Defendant's girlfriend reported that Defendant's four-year-old son from another relationship had behaved aggressively and inappropriately toward her and Defendant's nine-month-old son and her four-year-old daughter [Exh. 1, Doc. 7]. Defendant's girlfriend reported that Defendant did not assist her with watching the children, nor did he discipline his four-year-old son.

11

Karnell Wilcox, and a cousin, Jalen McMillian, are also involved. The informant showed the officers photographs of Defendant Wilcox and Ra'Shaun Wilcox processing heroin and fentanyl in the kitchen of 1605 Clear Brook Drive. The informant also stated that Defendant transports $100,000 to his mother's residence at 14106 Mapleridge Avenue in Detroit every other week. This informant stated that Defendant lives at 1605 Clear Brook Drive, Ra'Shaun Wilcox stays in an apartment at 112 East Fifth Avenue, and Karnell Wilcox stays at 228 Douglas Avenue, which is also the "work house" from which the DTO sells drugs. The informant stated that Defendant and members of the DTO keep a "work amount" of drugs at their residences, and Defendant and Ra'Shaun Wilcox store the remaining drugs in their storage units. The informant identified the name and location of Defendant's storage unit, which the officers confirmed with a subpoena to the storage unit.

Finally, according to Detective Parton's affidavit, a different confidential informant ("CS-4"), who admitted to being a drug dealer for the Wilson DTO, showed the affiant a photograph of two guns that he traded to Ra'Shaun Wilcox for five grams of heroin. Detective Parton stated that the two guns in the photograph "were the same color, make, and model of two guns that [he] had seen at 1605 Clear Brook" Drive on June 13, 2024.

Based upon the KCSO Property Receipt from the June 15, 2024 search of apartment 306 at East Fifth Avenue, officers seized currency, a large amount of suspected fentanyl, drug processing and packaging paraphernalia, a pistol, and ammunition [Exh. 1, Doc. 2]. Preliminary testing by the KCSO Narcotics Division identified the drugs as containing fentanyl and methamphetamine [Exh. 1, Doc. 3].

Detective Parton's affidavit in support of the search of 228 Douglas Avenue and Defendant's person largely contains the same information as his affidavit for apartment 306

[Exh. 1, Doc. 4]. This affidavit, also dated June 15, 2024, adds that law enforcement seized 9.6 pounds of fentanyl, 106 Suboxone strips, over 34 grams of methamphetamine, a handgun, and $47,295 in the execution of the search warrant at apartment 306 at East Fifth Avenue. Officers also found multiple pieces of mail addressed to Defendant at 228 Douglas Avenue. The utilities for 228 Douglas Avenue are in Defendant's name. The search of 228 Douglas Avenue yielded three firearms, seven Suboxone strips, several magazines, three cell phones, a bag of ammunition, and marijuana packaging [Exh. 1, Doc. 5].

Around 10:30 p.m. on June 15, 2024, DPD officers located Defendant Wilcox and Jalen McMillian in a vehicle[8] outside of Defendant's mother's residence at Mapleridge Avenue in Detroit, Michigan [*Id.*]. Officers arrested Defendants Wilcox and McMillian on warrants from Tennessee. Officers seized four cell phones, upon which Defendant Wilcox was sitting.[9] The driver of the vehicle, Karnell Wilcox, was released. Law enforcement obtained a search warrant for the Mapleridge residence and seized one firearm from a rear bedroom and two handguns from under the mattress in an adjacent bedroom.

At the July 17 hearing, AUSA Cook also proffered that Defendant is the leader of the fentanyl trafficking conspiracy operating from November 2023 until Defendant's arrest in June 2024. Law enforcement seized 4,360 grams of fentanyl during the search of a residence at 112 East Fifth Avenue, which was associated with the conspiracy. Additionally, officers seized three firearms and drug paraphernalia from a second house associated with the conspiracy and a search of Defendant's storage unit yielded two handguns. AUSA Cook also proffered that other firearms were seized during the search of Defendant's mother's residence.

---

[8]     One officer reported that Defendant McMillian was standing outside the vehicle.

[9]     One officer reported that Defendant McMillian also had three cell phones on his person.

Attorney Feuer asserted that Detective Parton's two affidavits show little connection between Defendant and the locations associated with the DTO. He proffered that the apartment at East Fifth Avenue was not leased in Defendant's name, nor frequented by Defendant. According to Mr. Feuer, the affidavit relating to 228 Douglas Avenue shows a greater involvement of other alleged members of the DTO. He proffered that Defendant was only visiting at the Mapleridge residence in Michigan at the time of his arrest and did not live there. Counsel proffered that, instead, Defendant has resided in Knoxville, Tennessee, for the last six years, and at the Clear Brook Drive residence for four years. Counsel stated that Defendant lives at that residence with his girlfriend and his two children.

Regarding the two KCSO Incident Reports [Exh. 1, Docs. 7 & 8], Mr. Feuer asserted that neither have resulted in charges against Defendant. Moreover, he argued that to characterize the June 13, 2024 report as child abuse strains the definition of that term. Mr. Feuer maintained that the June 13 Incident Report is akin to a welfare check on the children's behavior toward each other and contains no allegations that Defendant has been violent or negligent toward his children.

Mr. Feuer proffered that Defendant has minimal criminal history. He stated that other than a conviction from twelve years ago on which Defendant successfully completed judicial diversion, Defendant has only traffic offenses. He acknowledged that Defendant has several incidents of failure to appear between 2014 and 2023 but stated that most occurred between 2014 and 2018. Again, he noted that Defendant was not prosecuted for the Incident Reports of domestic matters from November 2023 and June 2024.

In argument, AUSA Cook stated that the Court must apply the rebuttable presumption that no conditions will assure Defendant is not a danger. He contends that Defendant engaged in a fentanyl trafficking conspiracy over a long period of time. A search of a residence linked to the

14

conspiracy resulted in the seizure of over four kilograms of fentanyl, which is a very dangerous drug. In addition to trafficking in dangerous drugs, Defendant had access to firearms in both residences and his storage unit. AUSA Cook argued that the danger posed by Defendant Wilcox stems from drugs and firearms. Moreover, Defendant presents a risk of non-appearance as demonstrated by his fourteen failure-to-appear warrants throughout his criminal history and as recently as 2023. AUSA Cook argued that Defendant's failures to appear indicate that he will not follow the orders of this Court.

AUSA Cook asserted that other aspects of Defendant's characteristics show him to be unsuitable for release. He has had no employment for the last one and one-half years. Defendant has been a daily drug user since he was a teen. Finally, AUSA Cook maintained that the KCSO Incident Report suggests Defendant has been violent in the residence where he proposes to live. Accordingly, the Government maintains that detention is appropriate in this case.

Mr. Burks asked the Court to give great deference to Judge Patti's conclusion that Defendant should be released on conditions, arguing that nothing has changed between Defendant's Michigan detention hearing and now. He agreed that the presumption in favor of detention applies in this case based upon Defendant's charges, but he argued that the locations searched in relation to the alleged drug conspiracy were not connected to Defendant Wilcox. Mr. Burks also argued that no charges were brought for the alleged domestic assault, and there are no allegations that Defendant committed child abuse.

With regard to Defendant's failure-to-appear warrants, Mr. Burks reviewed the offenses in the Pretrial Services Report and noted that other than two juvenile matters that were dismissed, they are all for misdemeanor driving offenses. He asserted that although Defendant missed some

court dates, all the offenses were ultimately dismissed and were minor. Mr. Burks contended that this history does not indicate that Defendant would not appear for hearings in this case.

As for Defendant's alleged dangerousness, Mr. Burks argued that Defendant has no felony or drug convictions. Finally, he stated that the record is devoid of evidence that Defendant may not own and possess firearms. He noted that no drugs were found in Defendant's storage unit, only two guns.

Mr. Burks agreed with the conditions proposed by the Michigan Pretrial Services and asked the Court to permit Defendant to return to live with his girlfriend and children at his home on Clear Brook Drive. He proffered that Defendant is self-employed selling items during online games. While Defendant does not earn much income from this work, Mr. Burks stated that Defendant is able to contribute to his household expenses. He agreed that Defendant's travel shall be restricted to the Eastern District of Tennessee and argued that if released on conditions, Defendant would be able to assist with his defense much more readily than if detained.

AUSA Cook asserted that the allegations of child abuse in the KCSO Incident Report from June 2024 are "indirect" and essentially allege that the children were violent toward each other while Defendant was present and that he did not intervene. He argued, however, that this and the November 2023 KCSO Incident Report both raise concerns about the suitability of Defendant's proposed residence.

Mr. Burks argued that while he does not contest that the presumption applies, Defendant overcomes the presumption of detention because fentanyl was not found in his residence or on his person. Instead, other alleged coconspirators lived at the locations where the fentanyl was seized. Mr. Burks maintained that only circumstantial evidence connected Defendant to the drug trafficking conspiracy alleged in Count One. He also argued that Defendant has no prior felony

convictions and can live with his girlfriend and child at the Clear Brook residence, where he has lived for some time.

As to the weight of the evidence of Defendant's dangerousness, Mr. Burks argued that Defendant was not directly connected to the four kilograms of fentanyl or to firearms seized during the execution of the search warrants. He asserted that Defendant's firearms were not connected to drugs. He also emphasized Defendant's lack of criminal history or any prior involvement with drugs. As for the weight of the evidence of Defendant's risk of nonappearance, Mr. Burks argued that Defendant resolved all prior failure-to-appear warrants, which were on misdemeanors. He asserted that if Defendant had not ultimately appeared, these charges would not have been dismissed. Mr. Burks argued that Defendant's actions on these minor citations are not indicative of how he will behave in relation to the current felony charges. He also noted that after spending time in custody awaiting the appeal of his release order, Defendant is aware of the consequences of failing to appear.

AUSA Cook objected to Defendant's assertion that he was not connected to the drugs seized in this case. He argued that the search warrant affidavits show that Defendant participated in the alleged crimes. The affidavits state that the utilities at 228 Douglas Avenue are in Defendant's name and that Defendant engaged in a hand-to-hand drug transaction on June 5, 2024. AUSA Cook stated that one of the confidential informants showed the affiant photographs of Defendant mixing drugs at his Clear Brook Drive residence. He argued that the conditions proposed by Defendant fail to address his significant danger. AUSA Cook maintained that Defendant seeks to be released to a residence in which he engaged in significant criminal behavior. Finally, he contends the proposed conditions do not address Defendant's repeated failures to

appear for court in other cases, which conduct reveals he is not likely to comply with any conditions the Court may impose.

After the undersigned heard the parties' proffers, evidence, and arguments,[10] she took the matter under advisement.

## IV.     ANALYSIS

The Bail Reform Act of 1984 provides for the release of all persons accused of a federal crime, either on personal recognizance or an unsecured appearance bond, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). If release on personal recognizance or an unsecured appearance bond will not reasonably assure the person's appearance or the safety of the community, the judicial officer shall order that the individual be released on conditions. 18 U.S.C. § 3142(c).

Upon the government's motion, however, the judicial officer may detain a person charged with certain serious federal crimes or who poses a "serious risk" of flight, witness intimidation, or obstruction of justice, if the judge finds, after a detention hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(f) & -(e). The judge may not detain a defendant unless the government proves by a preponderance of the evidence that the individual is a flight risk and/or by clear and convincing evidence that the person is a danger to the community or others. *See* 18 U.S.C. § 3142(f).

---

[10]     The undersigned also considers the June 28, 2024 Pretrial Services Report ("PSR") from the Eastern District of Michigan and the July 8, 2024 Memorandum from the United States Probation Office in this district.

"If a person is ordered released by a magistrate judge . . . , the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order[.]" 18 U.S.C. § 3145(a)(1). The district judge reviews the decision to release or detain the defendant de novo.[11] *United States v. Yamini*, 91 F. Supp. 2d 1125, 1128 (S.D. Ohio 2000) (holding that although the Sixth Circuit has yet to address this issue, the majority of circuits hold that de novo review is appropriate); *see also United States v. Rosello*, No. 1:21-cr-7, 2021 WL 5759142, at *1 (S.D. Ohio Dec. 4, 2021) (citing *Yamini*, 91 F. Supp. 2d at 1127–29); *United States v. Tolbert*, Nos. 3:09-CR-56 & 3:10-CR-30, 2017 WL 6003075, at *4 (E.D. Tenn. Dec. 4, 2017). "[M]eaningful *de novo* review means that the district court should engage in the same analysis, with the same options, under § 3142 as the magistrate judge." *Yamini*, 91 F. Supp. 2d at 1129; *Tolbert*, 2017 WL 6003075, at *4 (observing that the district judge has discretion to consider additional evidence to that presented at the original detention hearing). A motion to revoke a release order "shall be determined promptly." 18 U.S.C. § 3145(a).

To determine de novo whether Defendant Wilcox should be released or detained pending trial, the undersigned must first examine whether the presumption of detention set forth in 18 U.S.C. § 3142(e)(3) applies in this case, and if so, whether Defendant rebutted the presumption. If rebutted, the undersigned must then weigh the factors set out in 18 U.S.C. § 3142(g), along with

---

[11]    Although a magistrate judge cannot review another magistrate judge's decision to release a defendant, a district judge may refer the Government's motion to revoke a release order to a magistrate judge for report and recommendation. *United States v. Shaw*, No. 5:17-CR-26, 2017 WL 5711438, at *2–3 (E.D. Ky. Nov. 17, 2017), *adopted by* No. 5:17-CR-26, 2017 WL 5710443 (E.D. Ky. Nov. 27, 2017). The district judge will ultimately conduct a de novo review of the detention issue by reviewing the report and recommendation, which considers all the evidence offered to that point. *Id.* at *3.

    Upon questioning by the undersigned at the July 17 hearing, both parties agreed that the undersigned must undertake a de novo review of the evidence and record.

19

the rebutted presumption, to determine if release on conditions will reasonably assure Defendant's appearance at court proceedings and the safety of any person and the community. The Court examines whether clear and convincing evidence shows Defendant to be a danger to the community and/or whether a preponderance of the evidence shows him to be a flight risk and, if so, whether conditions can mitigate that danger or risk of nonappearance.

### A.      Presumption of Detention

Before turning to the § 3142(g) factors, the undersigned finds, and the parties agree, that a presumption in favor of detention applies in this case under 18 U.S.C. § 3142(e)(3). Section 3142(e)(3)(A) provides that, if a defendant is charged with an offense under the Controlled Substances Act, for which a maximum term of imprisonment of ten years or more is prescribed, a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. Section 3142(e)(3)(B) provides that if a defendant is charged with a violation of § 924(c), the same rebuttable presumption applies.

The Indictment provides probable cause to believe that the Defendant has committed offenses under the Controlled Substances Act for which he faces a maximum sentence of ten years or more and an offense under § 924(c). *See United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985))). Defendant therefore qualifies for the application of the presumption under § 3142(e)(3). This presumption places the burden of production with Defendant, while the Government retains the burden of persuasion. *Id.* at 945.

20

The next question, then, is whether Defendant has rebutted the presumption of detention. Defendant's burden to rebut the presumption "is not heavy" but he must come forward with some evidence. *Stone*, 608 F.3d at 945–46. The undersigned questions whether Defendant has carried that burden in connection with the de novo proceedings related to the Government's motion to revoke. Like his detention hearing in Michigan, Defendant notes his lack of criminal history and he asserts he has limited connection to the charged offenses. Unlike at his detention hearing in Michigan, Defendant does not offer a third-party custodian. *C.f.*, *United States v. Johnson*, No. 5:20-cr-33, 2020 WL 2413823, at * 4 (E.D. Ky. May 15, 2020) (finding that the defendant rebutted the presumption of dangerousness where he offered a third-party custodian). Moreover, while Defendant proposes that he will live at his Clear Brook Drive residence with his girlfriend and their child, the record is devoid of evidence that she is willing to permit Defendant to return to the residence. Instead, the record contains her prior report of domestic assault, in which she alleged that Defendant punched her in the face, and her recent report that Defendant failed to protect their nine-month-old infant from his four-year-old child. By his own admission to Michigan Pretrial Services, Defendant provides no financial support to the household and, instead, relies on his girlfriend to support him.[12] But for purposes of this Report and Recommendation, the undersigned will assume Defendant has rebutted the presumption. Under the law of the Sixth Circuit, if a defendant rebuts the presumption, the Court still must consider the presumption in its determination of whether conditions exist that could assure community safety and the defendant's appearance as required. *United States v. Hinton*, 113 F. App'x 76, 78 (6th Cir. 2004) ("The

---

[12] While defense counsel seemingly proffered during argument that Defendant has been working in online sales related to computer games, Defendant did not report this employment in his interview with Michigan Pretrial Services. Nor does his prior employment as a truck driver and a tow-truck driver indicate experience or skill with computers.

21

presumption in favor of detention does not vanish simply because a defendant comes forward with evidence to rebut it. Were the presumption to vanish, 'courts would be giving too little deference to Congress' findings regarding this class.'" (quoting *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986))); *see also Stone*, 608 F.3d at 945 (explaining that even when a defendant meets the burden of production, the Court must continue to weigh the presumption that detention is appropriate along with the other factors, because "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial").

### B. Section 3142(g) Factors

Turning to the § 3142(g) factors, the undersigned first considers the nature and circumstances of the charged offenses. 18 U.S.C. § 3142(g)(1). Defendant Wilcox is charged, along with two named codefendants and unnamed others, with conspiring to distribute 400 grams or more of fentanyl over an eighteen-month period [Doc. 7 p. 1]. Defendant is also charged with the possession of more than 400 grams of fentanyl for resale (Count Three) and the possession of firearms in furtherance of drug trafficking (Count Four) on June 3 through 14, 2024 [*Id.* at 2–3]. The Indictment charges Defendant with possessing and conspiring to distribute a large amount of fentanyl, which is a particularly dangerous controlled substance. *See United States v. Taylor*, 449 F. Supp. 3d 668, 673 (E.D. Ky. 2020) (finding fentanyl to be an "exceptionally dangerous drug" under § 3142(g)(1)); *see also United States v. McCollum*, No. 3:21-CR-35, 2021 WL 4468937, at *2 (E.D. Tenn. Sept. 29, 2021) (upholding magistrate judge's finding that fentanyl is a particularly dangerous drug under § 3142(g)(1)). Moreover, the circumstances of the offenses involve 4.3 kilograms of a mixture containing fentanyl, which was seized from an apartment used

22

by the DTO, and a total of five firearms,[13] which were seized from three locations associated with the DTO, including Defendant's storage unit. The undersigned finds that the nature and circumstances of the offenses show that Defendant Wilcox presents a serious danger to the community. *See* 18 U.S.C. § 3142(g)(1).

The weight of the evidence of the Defendant's dangerousness and risk of nonappearance also favors detention. 18 U.S.C. § 3142(g)(2). This factor "goes to the weight of the evidence of dangerousness [and risk of nonappearance], not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948; *see also United States v. Villegas*, No. 3:11-CR-28, 2011 WL 1135018, at *8 (E.D. Tenn. Mar. 25, 2011) ("In other words, this factor goes to how convincing the government's arguments of dangerousness and risk of flight are." (citation omitted)). Regarding Defendant's risk of nonappearance, the Court notes Defendant's multiple failures-to-appear. As for dangerousness, Detective Parton's affidavits relate that Defendant was the leader of a multi-state DTO trafficking in large amounts of fentanyl. Defendant allegedly traveled to Michigan every other week with $100,000 in drug proceeds. Defendant was photographed mixing and processing fentanyl in his residence at Clear Brook Drive, which he shares with his girlfriend, her young daughter, and their baby. Defendant's argument that only circumstantial evidence connects him to drug trafficking is belied by the affidavits' account that Defendant sold one ounce of heroin to an undercover officer on March 2, 2023; the report of Defendant's girlfriend that he left their home with $50,000 and drugs on November 8, 2023; and the information from CS-3, who showed the affiant photographs of Defendant processing fentanyl

---

[13] This total does not include the three firearms seized from the bedrooms of Defendant's mother's residence, where Defendant had been staying in Michigan, or the two firearms Detective Parton saw in Defendant's Clear Brook Drive residence on June 13, 2024, which Detective Parton believed were obtained in exchange for drugs.

in his home. As demonstrated by Exhibit 1, Defendant allegedly engaged in drug trafficking on behalf of the DTO. Given this activity, the weight of the evidence of Defendant's dangerousness is great. Indeed, drug trafficking is inherently dangerous, *United States v. Hernandez*, No. 1:02–CR–006, 2002 WL 1377911, at *2 (E.D. Tenn. Feb. 27, 2002), and "[i]t is beyond dispute that distributing narcotics is a serious offense that poses dire health risks to the community—and the risks associated with fentanyl specifically are even greater," *Taylor*, 449 F. Supp. 3d at 673. Moreover, Defendant's processing of fentanyl in his residence endangered his girlfriend and the young children who live there.

Next, the undersigned must consider a host of factors relating to the history and characteristics of the Defendant. 18 U.S.C. § 3142(g)(3)(A). Although Defendant has no history of felony convictions, the bulk of his Defendant's history and characteristics support detention. Defendant has close family ties to his family in Detroit, Michigan, as demonstrated by Defendant's mother's willingness to serve as his third-party custodian and give a security bond on her home and by his parents' and many relatives' attendance at his July 2, 2024 detention hearing in Michigan. The PSR, prepared on June 28, 2024, states that Defendant has three children who live in Michigan (one with Defendant's mother and two with their separate mothers) and maintains regular contact with his seven siblings who reside in Michigan. This family support, however, is balanced by the fact that Defendant's two brothers and his cousin were allegedly members of his DTO and that Defendant is not proposing to live in Michigan. Instead, Defendant seeks to reside with his girlfriend and his child who live in Knoxville, Tennessee. Although Defendant reports that he and his girlfriend have been together for three years, the undersigned has no evidence of her support for Defendant or her willingness to allow him to return to their home in Knoxville. Nor does the undersigned find the Knoxville residence to be a suitable place for Defendant to live,

even if Defendant's girlfriend were in agreement with him living there, given it was a location where he allegedly processed drugs and held firearms linked to the DTO.

Defendant has not been employed for eighteen months and his prior employment was in Michigan, rather than Tennessee. Defendant has provided no support for counsel's passing proffer of online employment. The PSR reflects that Defendant reports using marijuana daily since age sixteen. Although recreational marijuana use is legal in Michigan, recreational marijuana use is not legal in Tennessee, where Defendant has lived for the last six years. Detective Parton's affidavits state that officer's responding to a domestic matter at Defendant's Clear Brook Drive home on June 13, 2024, found a pervasive odor of marijuana and observed marijuana on a desk.

The PSR also reveals that in addition to a diverted felony conviction for larceny and receiving and concealing stolen property at age twenty, Defendant has twelve citations for various misdemeanor traffic offenses from 2013 through 2021. Defendant had at least one failure-to-appear warrant for each of these offenses except for one in 2013. *See Tolbert*, 2017 WL 6003075, at *4 (holding that "the court may consider both actual convictions and mere arrests or indictments to assess the defendant's dangerousness, though the latter will typically weigh less heavily in favor of detention"); *see also United States v. Acevedo-Ramos*, 755 F.2d 203, 209 (1st Cir. 1985) (finding that the authors of the Bail Reform Act of 1984 intended for judges to "rely on a defendant's past bad conduct that had led to indictment but not conviction" under some circumstances). Defendant's arrest history also includes juvenile arrests for felony unarmed robbery, carrying a concealed weapon, and possessing a weapon in a school zone.

As for "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," 18 U.S.C. § 3142(g)(4), the undersigned finds that the danger Defendant presents to the community is from continued drug trafficking. Defendant is alleged to

25

have participated in a conspiracy trafficking over 400 grams of fentanyl and ten times that amount was seized from an apartment associated with the DTO. Defendant is alleged to have traveled every other week from Knoxville, Tennessee, to Detroit, Michigan, with $100,000 in drug proceeds to procure more drugs for the DTO. Additionally, Defendant kept firearms in his residence and his storage unit that were linked to the DTO. This shows Defendant presents a particular danger to the community—that is, continued drug trafficking— if he were released. *See Hernandez*, 2002 WL 1377911, at *2 (holding that "the risk of continued drug-trafficking while released on bail constitutes a significant danger to the safety of the community"). Moreover, the undersigned finds that Defendant presents a particular danger to his girlfriend and the children who live in his home, where he allegedly engaged in processing fentanyl for resale.

Thus, the undersigned finds all four of the § 3142(g) factors support detention. The undersigned also observes that the United States Probation Office in this district recommends that Defendant not be released because of his dangerousness and risk of nonappearance. Considering all the § 3142(g) factors and the presumption, assuming it has been rebutted, the undersigned finds that the information provided in the PSR and Exhibit 1 establishes by clear and convincing evidence that the Defendant poses a danger to the community. The undersigned also finds by a preponderance of the evidence that Defendant presents a risk of nonappearance with his lack of a stable residence in this district, strong ties to Michigan, and multiple failure to appear warrants.

The undersigned further finds that no condition or combination of conditions will reasonably assure the safety of the community or Defendant's appearance in this case. The undersigned has considered the proposed conditions offered in connection with the undersigned's de novo review, including that Defendant will live with his girlfriend and their child at his Clear Brook Drive residence, that he will submit to drug testing, maintain employment, and that he will

not possess firearms. Defendant has no stable employment history, and his employment history has been in Michigan. He also reported using marijuana daily despite living in Tennessee, where such use is illegal. Defendant, moreover, has repeatedly violated court orders to appear. All of this leaves the undersigned with little confidence that Defendant would follow any conditions the Court would impose. The undersigned further finds that Defendant presents a danger to those with whom he proposes to live.

## V.       CONCLUSION

Based upon a de novo review of all the evidence presented at the detention hearing in the Eastern District of Michigan and to the undersigned, and considering the factors set forth in 18 U.S.C. § 3142(g), the presumption, assuming it has been rebutted, and the recommendation of the United States Probation Office in this district, the undersigned finds by clear and convincing evidence that Defendant Wilcox poses a danger to the community and by a preponderance of the evidence that he poses a risk of nonappearance. The undersigned also finds that there are no conditions that would mitigate that danger and reasonably assure the safety of the community or Defendant's appearance for court proceedings.

Accordingly, the undersigned **RECOMMENDS** that the District Judge grant Government's Emergency Motion [Doc. 108], revoke the release order, and order that Defendant remain detained pending further proceedings in this case.[14]

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[14]     Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Id.*; *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

28